(No. 6247. May 4, 1936.)

BOISE PAYETTE LUMBER COMPANY, a Corporation, Appellant, v. IDAHO GOLD DREDGING CORPORATION, a Corporation, Respondent.

[58 Pac. (2d) 786.]

Alfred A. Fraser and Richards & Haga, for Appellant.

Luther W. Tennyson and Hawley & Worthwine, for Respondent.

HOLDEN, J.—This suit was commenced February 15, 1935, for the purpose of perpetually enjoining the collection of a judgment theretofore recovered by the respondent against appellant for the sum of one hundred thousand dollars. It is alleged in the complaint that appellant (hereinafter called the Lumber Company), during the year 1920 and for each year thereafter until the forepart of the year 1926, was engaged in cutting timber on the public domain under contracts with the United States Forest Service, and on other lands situated in what is known as Boise Basin, Boise County, and on tributaries of Grimes Creek in said Boise Basin; that as a part of its logging operations, it trans-

ported the logs so cut to the railroad landings by skidding the logs through chutes constructed for that purpose, and in places where the gradient was low, the Lumber Company reduced the friction by oiling and greasing the logging chutes. Some of the oil and grease, in the course of the logging operations, dropped from the chutes to the ground or would be otherwise wasted on the ground along the course of such chutes.

That from about the middle of April, 1926, to on or about the 13th day of April, 1928, the predecessor in interest of the Idaho Gold Dredging Corporation (respondent), hereinafter called the Mining Company, to wit, the Gold Dredging & Power Corporation, was engaged in dredging certain placer mining claims then owned by it and located in the valley of Grimes Creek and along the banks of the creek, and from about the 13th day of April, 1928, to the 4th day of June, 1929, the Mining Company, successor in interest of the Gold Dredging & Power Corporation, was engaged in dredging said mining claims, some of which were located below the mouth of the tributaries of Grimes Creek, on the water-sheds of which the Lumber Company was carrying on its operations.

That on June 25, 1929, the Mining Company commenced an action in the court below against the Lum' er Company (*Idaho Gold Dredging Corp. v. Boise Payette Lumber Co.,* .52 Ida. 766, 22 Pac. (2d) 147.), whereʰy the Mining Company sought to recover damages from the Lumber Company, alleged to have been sustained from the oil and grease used by the Lumber Company in its said logging operations. Such proceedings were had therein that on March 29, 1930. the Mining Company filed its third amended complaint, in and by which it alleged in substance that water from the rains and melting snows carried oil and grease from the Lumber Company's logging operations into Grimes Creek and polluted the water of said creek, and that such polluted water collected on the dredge ponds of the Mining Company and was, by the dredging operations, conveyed to the gold-saving devices, and such polluted water and the oil and grease contained therein contaminated the mercury used by the Min-

ing Company for amalgamating, collecting and saving the gold, and that the mercury, when so contaminated with oil and grease, would not amalgamate the gold, and that it was, therefore, impossible for the Mining Company to extract and save the gold in said mining property, and that only a small part of the gold contained in said property could be recovered or saved.

It is further alleged therein that the mining property so affected, and which could not be profitably mined for the reasons aforesaid, had an actual cash value, based on the gold contents therein on the 25th day of June, 1925, of $389,369.45, and that the presence of oil and grease on the waters of Grimes· Creek made it impossible for the Mining Company to recover such gold, and that the value of such property had been totally destroyed by the oil and grease from the Lumber Company's operations.

It is also alleged that the Lumber Company filed an answer in said action to respondent's third amended complaint, in which it denied generally each and every allegation therein contained, and further alleged that the right of the Mining Company to recover in said action was barred by the statute of limitations.

It is alleged that on the trial of that cause (*Idaho Gold Dredging Corp. v. Boise Payette Lumber Co., supra*), the Mining Company introduced evidence in support of its claim that the oil and grease, while floating in or commingled with the waters of Grimes Creek, could not be seen, observed or detected, and that it did no damage whatever to the mining property until the Mining Company trapped or collected such oil and grease on its dredge ponds in its dredging operations, and that the damage to the mining property was done by the Mining Company commingling and mixing, by its dredging operations, the polluted or contaminated water in its dredge pond with the gold-bearing gravels as the same were conveyed into and through the dredge in the dredging operations. And it is alleged in the complaint in this action that the Mining Company's president and general manager, S. K. Atkinson, testified as to how the oil and grease damaged the mining property, substantially as follows:

"I don't know that it damaged our land any until we created a dredge pond and stopped it. . . . . And the only way we found it out was when we dredged it. We didn't know is was damaged until we started to dredge. We created a trap that catches that grease and oil that comes down in our dredging operations. . . . . There is no oil mixed with the top soil of the mining claims that I know of, until we actually mix it in our dredging operations. Until we make our pond and get the oil in it the land is not damaged."

That Atkinson further testified in behalf of the Mining Company that its mining operations, and those of its predecessor, the Gold Dredging & Power Corporation, were unprofitable, but were, nevertheless, carried on for the full period of three years at a daily loss, during which said Mining Company did not recover actual operating expenses, it being claimed said losses were due wholly to the fact that the oil and grease contaminated the mercury and gold-saving devices on the dredge to such an extent that the gold could not be amalgamated, or saved, or extracted from the sand and gravel; that he further testified that neither the Mining Company, nor its predecessor in interest, ever notified the Lumber Company, or any of its officers or representatives, that there was any oil or grease interfering with mining operations, or that oil was causing any damage to the Mining Company, or its predecessor in interest, or that there was any oil or grease whatsoever on the water of Grimes Creek or its tributaries; that Atkinson also testified that the facts as to damage being sustained by the Mining Company and as to the presence of such oil and grease, were intentionally concealed from the Lumber Company.

It is further alleged that upon the trial of the action for damages (*Idaho Gold Dredging Corp. v. Boise Payette Lumber Co., supra*), the Mining Company also introduced evidence to the effect that it, and its predecessor in interest, had dredged during their dredging operations 1,579,764 cubic yards, and that the area alleged to be affected by such oil and grease which had not been dredged, contained 638,770 cubic yards, making a total of 2,218,534 cubic yards of dredgeable placer mining ground alleged to have been totally destroyed

by the presence of such oil and grease in the waters of Grimes Creek, in an amount sufficient to prevent profitable dredging of the ground or the recovery of the gold contained therein; that the Mining Company further introduced evidence that it, and its predecessor in interest, had carefully tested and determined the value of such placer mining ground prior to the time the same was dredged; that such testing had been made by drills manufactured for such purpose; that numerous drill holes had been made ahead of the dredging operations; that such drill tests showed the value of the ground before it was dredged; that the recoveries made by the dredge were only about twenty-five per cent of the value of the ground as disclosed by the drill tests, which tests showed values varying from 20¢ to 25¢ and 30¢ and more per cubic yard, and that the difference between the amount actually recovered by the dredge and the value as shown by the drill tests was lost because the water of Grimes Creek was polluted by oil and grease which contaminated the mercury and gold-saving devices to such an extent that it prevented the dredge from recovering or saving such values; that Atkinson also testified that, from his experience in carrying on such dredging operations, it was his opinion that the oil would continue indefinitely to pollute the water and prevent successful mining of said mining property, and that the value of such property was totally destroyed, as the same had no value for any purpose other than mining; that he further testified that the gold which had not been saved or extracted from the gravel deposits that had passed through the dredge, and constituting what is known as the dredged part of the mining operations, could never be recovered because the dredging operations had so commingled and mixed the oil which had been caught and trapped on the dredge pond, with the gold-bearing gravel as it was conveyed through the dredge, that all of the said gravel had become contaminated with such oil to such an extent that the gold contained therein could not be amalgamated, saved or recovered, and that it was his opinion that the ground which had been dredged had now no value whatsoever and that the value of the undredged ground was $107,000 before the oil interfered with the dredging opera-

tions, but that such ground had now no value whatsoever because the oil would forever interfere with and prevent the successful mining of that ground.

It is also alleged that the court instructed the jury that the damages awarded should be measured by the value of the ground immediately before and immediately after the oil appeared in sufficient quantities to interfere with mining operations, and the jury returned a verdict against the Lumber Company in the sum of $100,000, and judgment was thereupon entered in favor of the Mining Company and against the Lumber Company for that amount; that the Lumber Company thereupon made an application for a new trial of said cause, and while said motion was pending and before a decision was rendered thereon, the Lumber Company also perfected an appeal from said judgment to this court; that, thereafter, the district court granted the Lumber Company's motion for a new trial and vacated and set aside the judgment so entered against it. The Mining Company thereupon appealed to this court from the order vacating and setting aside said judgment and such proceedings were had on said appeal that, on March 6, 1933, this court rendered its decision wherein it held that the trial court erred in granting the Lumber Company a new trial, and the district court was, accordingly, directed to reinstate the judgment (*Idaho Gold Dredging Corp. v. Boise Payette Lumber Co., supra*) ; that, thereafter, May 27, 1933, the district court reinstated the judgment against the Lumber Company as of the date of the original entry thereof; that thereupon, the Lumber Company proceeded with the appeal which it had previously perfected from the original judgment entered against it as above stated; that September 21, 1934, this court rendered its decision on said appeal. (*Idaho Gold Dredging Corp.* v. *Boise Payette Lumber Co.,* 54 Ida. 765, 37 Pac. (2d) 407.)

Having pleaded the history of the litigation between the parties, and certain evidence, as hereinbefore set out, the Lumber Company then summarizes its case for injunctive relief against the Mining Company, as follows:

"That the verdict and judgment so obtained by the Mining Company against the Lumber Company, as aforesaid, are

most inequitable, unconscionable and unfair, and the same were obtained by the Mining Company deceiving and misleading the jury and the Court; that the following are among the fraudulent acts, practices and conduct above referred to:

"(a) That the Mining Company, by the testimony of its said witness, S. K. Atkinson, represented and made the Court and jury believe that oil and grease, which it was alleged and claimed came from the logging operations of the Lumber Company, would continue to flow indefinitely, and that by reason thereof the mining property could never be successfully mined or operated, and that the value thereof had, by such oil and grease, been totally destroyed. That such testimony was merely opinion and conjecture on the part of said S. K. Atkinson, and the same was incorrect and false but was believed by the jury and the Court, because said Atkinson claimed to have gained much information and knowledge on the subject, because of having had general management and charge of said dredging operations for more than three years, and the testimony of said Atkinson on that point was accepted by the jury as the basis for the verdict, and was held by the Court on appeal to be sufficient to support the verdict, but plaintiff herein now shows and represents to the Court that it has lately, and long since the time expired for presenting the same in connection with its motion for new trial, obtained evidence that the water of Grimes Creek is no longer contaminated or polluted with oil and grease, and that if such water ever was so contaminated said oil and grease have now ceased to flow and no longer pollute or contaminate such water. That for many years last passed the water of Grimes Creek below the mouth of the tributaries on which the logging operations were conducted by the Lumber Company has been used throughout the year and as long as such water would flow for placer mining purposes by numerous people, including the said Atkinson, for operating placer mining dredges and other placer mining machinery and equipment, without any hindrance or interference whatsoever from oil or grease, and there is not now, and has not been for several years last passed, sufficient oil or grease in the water of

Grimes Creek below the mouth of the tributaries on which said logging operations were conducted to interfere with any mining operations such as were carried on by the Mining Company, or such as are best adapted to the mining of the ground owned by the Mining Company and for which it recovered damages, as aforesaid. That all of the ground for which the Mining Company recovered damages can now be dredged or otherwise mined without hindrance or interference of any kind from oil or grease from the logging operations of the Lumber Company. That the testimony at the time of said trial, as to when such oil or grease would cease to flow or disappear, was merely conjecture or opinion, but positive and conclusive evidence is now available that such oil and grease have disappeared, and do not now interfere, and for several years last passed have not interfered, with such mining operations. That the Mining Company can now mine its said mining property, for which damages were recovered against the Lumber Company, and recover by dredge, or other suitable mining machinery, all gold contained therein up to the normal or reasonable efficiency of such mining machinery and equipment and without any hindrance or interference from oil, and plaintiff herein shows that a judgment has been entered against it for the full value of said mining property, upon the erroneous assumption and upon the false and misleading proof or conjecture of the Mining Company, that the property had been totally destroyed; that it would be most inequitable, unconscionable and unjust for the Lumber Company to be compelled to pay such judgment and for the Mining Company to thereby receive damages for the full value of the property and at the same time have its property, undiminished in value, undamaged and unaffected by the oil and grease, which it erroneously and falsely claimed had destroyed its value. That the Lumber Company at no time conceded that the said mining property had been damaged, and at all times contended that oil and grease from its operations had not caused any damage and would not in the future continue to flow so as to interfere with the Mining Company's operations, but at the time of the trial, and for a long time thereafter, the positive and

conclusive proof, which may now be had, was not then available. That to allow the Mining Company to collect the judgment obtained against the Lumber Company, under the circumstances, would deprive the Lumber Company of the guarantees given to it by the Fourteenth Amendment to the Constitution of the United States, and particularly in this, that it would deprive the Lumber Company of its property without due process of law, and deny to it the equal protection of the law.

"(b) That the Mining Company and its officers intentionally and purposely, and for the purpose of defrauding the Lumber Company and preventing it from protecting its rights and securing justice, concealed from the Lumber Company and its officers and employees, until the complaint in said cause was served upon the Lumber Company on or about the 25th day of June, 1929, the fact that any oil or grease whatsoever had been found by the Mining Company in the waters of Grimes Creek, or its tributaries, and for the reasons aforesaid, it concealed from the Lumber Company the fact that any oil or grease from said logging operations was interfering in any manner whatsoever with the Mining Company's dredging operations, or was causing any damage to the Mining Company, and for more than three years prior to the filing of said complaint, the Mining Company, and its predecessor in interest, which was managed, as aforesaid, by the said S. K. Atkinson, knowingly continued the dredging operations at a daily loss, recovering less than the actual operating expenses, and to mix and commingle by such dredging operations the alleged polluted waters of Grimes Creek with the gold-bearing gravel in the Mining Company's placer property, and claimed, upon the trial, that by reason of such mining operations it had become impossible to recover the gold contained in the gravel that had passed through the dredge and become contaminated by the oil and grease in the polluted water.

"That the Mining Company, during the said period of more than three years, dredged substantially all the ground which it had drilled and tested, as hereinbefore alleged, and having fraudulently, and with a view of deceiving the Lumber Company, concealed from it, as herein alleged, the fact

that oil was interfering with the dredging operations, the Lumber Company was deprived of the opportunity to secure any evidence as to the value of the ground before the same was dredged, by making independent tests to protect itself against the claims of the Mining Company, and the Lumber Company was, accordingly, at the time of the trial of said cause, placed at great disadvantage in obtaining evidence and proving the value of the ground before the same was dredged. That the Mining Company claimed to possess the only dependable evidence as to such value, but plaintiff is now informed and believes, and so alleges the fact to be, that the Mining Company, by its said conduct, intended to force the Lumber Company into the position where it had to accept the evidence of the Mining Company as to the value disclosed by such tests, and thereby prevent the Lumber Company from properly defending or protecting its rights. The course pursued by the Mining Company in the above matters resulted in depriving the Lumber Company of evidence that it should and ought to have had in order to properly protect its rights in the premises and of the opportunity to investigate and determine, during the dredging operations, whether the alleged interference from oil and grease was due to the polluted water alleged to have come from the logging operations, and whether the ground contained the values before it was dredged that it was represented to have by the Mining Company, and its witness, S. K. Atkinson; that the testimony offered by the Mining Company with reference to the value of its said mining property was false, and its conduct in the matter was fraudulent and deceptive, and by such testimony the Mining Company imposed upon and deceived the Court and jury, and the verdict which it obtained, as aforesaid, was based upon and was the result of the said fraudulent conduct of the Mining Company and the false testimony which it produced as to the value of its said property, and the loss resulting from the alleged interference of the oil with the mining operations; that the conduct of the Mining Company in the premises resulted in a verdict and judgment thereon that is most unconscionable, unjust, inequitable and unfair, and is contrary to the true facts, and the evidence now available could not, by reasonable diligence, have been obtained

in time to be used on the trial of the cause or within the time fixed by law for applying for a new trial on the ground of newly discovered evidence; that the Mining Company, by its conduct and testimony, above referred to, has deprived the Lumber Company of its property without due process of law and denied to it the equal protection of the law, contrary to the provisions of the Fourteenth Amendment to the Constitution of the United States.

"(c) That the Mining Company misled and deceived the Court and jury as to the value of its mining property and the damages which it claimed to have sustained and the liability of the Lumber Company therefor; that such evidence related to the existence of the oil and grease on the water and the extent thereof, and the extent to which it would interfere with the mining operations, and the extent of the damages it had caused and would cause if the mining operations would continue; that, among other things, the Mining Company submitted evidence as to the value of its ground, which it represented was the result of drill tests made before the ground was dredged, and which evidence it was impossible for the Lumber Company to check by tests made after the ground had been dredged; that the Mining Company represented that its tests disclosed average values from the surface of the ground to bedrock, running as high as 30¢ to 32¢ and more per cubic yard for large tracts, and it claimed that such values had been obtained from drill tests carefully and honestly made, when, in truth and in fact, as the Lumber Company is now informed and believes, and so alleges the fact to be, the ground which had been so tested was covered by from 16 to 18 feet of gravel and debris that had been previously mined and from which the gold had been extracted by earlier mining operations and the values to which the said S. K. Atkinson and other witnesses for the Mining Company testified as being average values from the surface to bedrock, were in truth and in fact the values in the lower three or four feet of ground immediately above bedrock and below the debris and gravel which had been previously mined, and such values were not the average values from the surface of the ground to bedrock, as testified to and represented by the witnesses for the Mining Company, but, for the reasons

hereinbefore alleged, it was impossible for the Lumber Company to protect its rights in the premises or determine the truth of such evidence after the ground had been dredged and the gravel commingled with the water, which the Mining Company claimed had been so polluted and contaminated that the value in the dredged gravel could not be accurately ascertained and determined; that by the dredging of the ground, the surface gravel and the bedrock gravel had been completely mixed and commingled and their relative positions changed to such an extent that it was impossible to determine the values that had been found in the different layers or strata before dredging, or in the condition that the same were when the Mining Company claimed to have drilled and tested the same; that the Lumber Company, was, under the circumstances, greatly handicapped in ascertaining the truthfulness of the statements of the witnesses of the Mining Company as to the condition and value of the ground before the same was dredged. That the representations so made by the Mining Company were false and fraudulent and were made for the purpose of misleading and deceiving the Court and jury, but the information as to the falsity of such testimony was not available and could not be obtained prior to or at the time of the trial or before the time fixed by law expired for obtaining a new trial on the ground of newly discovered evidence. Such evidence is now available, and the verdict and judgment obtained on such false evidence and because of the fraudulent conduct of the Mining Company, hereinbefore referred to, should be vacated and set aside and the execution thereof enjoined. That the Lumber Company was prevented by such fraudulent conduct, unmixed with any fault or negligence of its own, from having a fair and honest trial, and the judgment so obtained by the Mining Company is unconscionable, unjust and inequitable, and deprives the Lumber Company of its property without due process of law, and denies to it the equal protection of the law, contrary to and in violation of the rights guaranteed to the Lumber Company by the Fourteenth Amendment to the Constitution of the United States.''

The Mining Company demurred to the complaint of the Lumber Company upon the ground that it did not state facts

sufficient to constitute a cause of action, or to entitle the Lumber Company to the relief it prayed for, or to any relief. The trial court sustained the demurrer, and dissolved the temporary injunction theretofore issued, restraining the collection of said judgment, but suspended its order dissolving the temporary injunction during the pendency of the appeal of the Lumber Company to this court, from the judgment of the trial court dismissing the Lumber Company's complaint and action against the Mining Company.

The Lumber Company relies upon the following grounds for a reversal of the judgment of dismissal, to wit:

1. Mistake, in that the judgment for $100,000 rests upon the erroneous and mistaken view that the oil would continue to flow indefinitely and that, therefore, respondent's property had been totally destroyed; that since the judgment was entered, conclusive evidence has become available that the property has not been destroyed, or injured, or diminished in value; that the oil has ceased to flow, and that all minerals contained in the property may now be recovered; that if respondent is entitled to any damages, it would only be for temporary delay, and not for destruction of its property.

2. Fraud, in that for a period of about four years prior to the trial of respondent's action for damages (*Idaho Gold Dredging Corp. v. Boise Payette Lumber Co., supra*), it was engaged in building up its own case and in destroying evidence which appellant would require to defend its rights in the damage case; that respondent concealed the destruction of such evidence and that it gave the Lumber Company no warning of its purpose to bring the action for damages until the action was commenced; that the judgment was recovered by a fraudulent scheme, contrived and carried out over a long period, for the purpose of trapping the Lumber Company and obtaining a judgment against it at a time when it could not obtain the evidence to protect its rights; that therefore, the court and jury would have to rely upon the evidence of the Mining Company, which the Lumber Company claims time has shown wholly untrustworthy.

3. Perjury, in that the judgment was obtained upon false and perjured testimony.

4. That "The guarantees of due process of law and of the equal protection of the law by the Fourteenth Amendment to the Constitution of the United States are not satisfied by a procedure which provides no relief from unconscionable judgments that take one's property and that were obtained by fraud, perjury, or mistake, or by a procedure that refuses to recognize newly discovered evidence that would have been a complete defense if it had been available at the trial."

██ ██ We will first discuss and determine the preliminary contention of the Lumber Company that there are no issues of fact, and that every fact alleged in its complaint stands admitted in this court under the general demurrer of the Mining Company, and that this court, in passing upon the sufficiency of the complaint, must confine itself to an examination of the complaint in connection with the general demurrer interposed thereto, and the contention of the Mining Company that this court may examine and consider the record and briefs in said action for damages (*Idaho Gold Dredging Corp. v. Boise Payette Lumber Co., supra*), and, further, that its general demurrer does not admit conclusions of law. This court held in *Denton v. Detweiler*, 48 Ida. 369, 375, 282 Pac. 82, that "In passing on a demurrer, the court may consider only the pleading before it, and cannot refer to other pleadings in the cause to determine when the action was commenced" (citing cases), and that a pleading "must be sufficient in itself." (See, also, 6 Standard Ency. Proc., p. 981; *National Casket Co. v. Stolts*, 174 Fed. (C. C. A., Sec. Circuit) 413; *Ryan v. Knights of Columbus et al.*, 82 Conn. 91, 72 Atl. 574; *Frank v. Western Electric Co.*, 24 Fed. (2d) (C. C. A., Sec. Circuit) 642; *State v. Thompson*, 58 Utah, 291, 199 Pac. 161, 38 A. L. R. 697.) If a pleading, on demurrer, must be sufficient in and of itself, and if the court cannot refer to other pleadings for the purpose of aiding an otherwise insufficient pleading, then the converse of that rule must be that the court cannot refer to other pleadings, or records, or briefs, for the purpose of. aiding it in determining that a pleading is insufficient. And in passing on a demurrer, "every material allegation of the plaintiff's complaint which is well pleaded must be taken as true"

(*Blackwell v. Kercheval*, 27 Ida. 537, 543, 149 Pac. 1060; *Ashley v. Richard*, 32 Ida. 551, 185 Pac. 1076; *J. C. Penney Co. v. Diefendorf*, 54 Ida. 374, 32 Pac. (2d) 784; *Fond v. McCreery*, 55 Ida. 144, 39 Pac. (2d) 766; *Henderson v. Twin Falls County*, 56 Ida. 124, 50 Pac. (2d) 597, 101 A. L. R. 1151), but mere conclusions of law are not admitted by demurrer. (*Smallwood v. Jeter*, 42 Ida. 169, 244 Pac. 149; *J. C. Penney Co. v. Diefendorf, supra*.) While a general demurrer does not admit mere conclusions of law, it is well settled that it does admit all the facts properly pleaded, as well as all reasonable inferences which can be drawn therefrom. Hence, there is but one question for determination: Does the complaint state a cause of action?

The grounds upon which the Lumber Company relies for a reversal of the judgment in the case at bar will be discussed in the order above stated, to wit, mistake, fraud, perjury and due process of law.

It is alleged in the Lumber Company's complaint that Atkinson testified in the action for damages that the oil would continue to flow indefinitely. In its brief, the Lumber Company states that its first "ground for relief does not rest upon fraud, but purely upon a mistake as to the time that oil would (continue to) interfere with the mining operations," and it argues that "A judgment based on a mistake, or which newly discovered evidence shows would not have been entered if such evidence had been available at the time of the trial, is unconscionable and the enforcement thereof will be enjoined by a court of equity," and that "The Mining Company holds a judgment for the full value of its property, and it also has its property uninjured and undiminished in value." What kind of mistake, then, does the Lumber Company claim was made in the trial of the action for damages, a mistake of fact, or a mistake of theory? It is clear that the contention of the Lumber Company is, and necessarily must be, that the judgment for $100,000 recovered against it was for a total destruction of the placer mines, based upon a mistaken theory that the oil would continue to flow indefinitely, that is to say, for an indefinite length of time. And so it is made to appear, on the point of the alleged mistake, that the issue in the action for dam-

ages, was: Will the oil continue to flow indefinitely, that is to say, for an indefinite length of time, or is the flow of the oil, constituting the nuisance, temporary? Both litigants were relying upon opinion and theory; one to recover damages, and the other to defeat a recovery, or at least to substantially reduce the amount of recovery. The evidence on that issue consisted of opinions. That issue was not determined by factual evidence. Broadly speaking, then, one of the theories must necessarily have been mistaken. Had the Lumber Company defeated a recovery, then the Mining Company could just as logically have contended that a recovery of the damages it had sustained was defeated by the erroneous theory of the Lumber Company that the flow of the oil, constituting the nuisance, was temporary, and that it could prove by newly discovered evidence that the oil would continue to flow for an indefinite length of time; therefore, that the theory upon which the Lumber Company defeated a recovery was mistaken and erroneous, and that in consequence of the acceptance of the mistaken theory of the Lumber Company, it had been deprived of valuable property without any compensation whatever, and that "A judgment based on (such) a mistake, or which newly discovered evidence shows would not have been entered if such evidence had been available at the time of the trial, is unconscionable."

While we have carefully examined all the cases cited by the Lumber Company in support of the several grounds above set forth, time and space make it impossible to do more than review a few of the cases chiefly relied upon for a reversal of the judgment of dismissal.

Among the cases cited by appellant in support of the first ground, to wit, alleged mistake, are *Fogel v. Interborough Rapid Transit Co.*, 53 Misc. 32, 103 N. Y. Supp. 977, *Reed v. Harvey*, 23 Ark. 44, *Bacon v. Bacon*, 150 Cal. 477, 89 Pac. 317, and *Anshutz v. Louisville Ry. Co.*, 152 Ky. 741, 154 S. W. 13, 45 L. R. A., N. S., 87.

In *Fogel v. Interborough Rapid Transit Co.*, *supra*, Fogel (an infant), by his guardian *ad litem*, sued to recover for personal injuries. The evidence was conflicting on the question whether there was a fracture of the spinous processes

of the vertebrae which might be followed by permanent paralysis. A verdict was rendered for plaintiff. Thereupon, the Rapid Transit Company appealed to the Appellate Division of the Supreme Court of the State of New York, First Department, which affirmed the judgment (103 App. Div. 609, 93 N. Y. Supp. 1132). The company then appealed to the Court of Appeals of the State of New York, which court also affirmed the judgment of the trial court, but held ''that the affirmance of the judgment appealed from should be without prejudice to the right of the defendant (Rapid Transit Company), upon proper proofs showing that paralysis has not occurred, to move for a new trial of this action.'' (*Fogel v. Interborough Rapid Transit Co.*, 185 N. Y. 562, 77 N. E. 1022.) Thereafter, the Rapid Transit Company moved for a new trial. The supreme court, in passing upon the company's motion for a new trial said: ''A number of affidavits have been submitted by defendant (Rapid Transit Company) which abundantly establish the fact that paralysis has not occurred, although more than three years have passed since plaintiff received his injuries. No depositions have been submitted in opposition, and upon the argument it was frankly admitted by his counsel that plaintiff has not suffered and is not now suffering from paralysis. Motion is therefore granted.'' The right to move for a new trial having been expressly granted by the New York Court of Appeals, the Rapid Transit Company could, and did, move for a new trial in the case in which the judgment was recovered, and it being frankly admitted that the infant had not suffered and was not suffering from paralysis, the motion was, of course, granted.

*Reed v. Harvey, supra:* Reed and one John Sumner became liable to Harvey for the payment of professional services in the settlement of a guardianship. Harvey sued to recover for such services. On the trial, Sumner was put on the stand as a witness for Harvey. On the way to the witness-stand to testify, Sumner paid Harvey for such services. Reed did not know, and it appears had no way of knowing, that Sumner had paid Harvey, until after judgment was rendered against him. Harvey attempted to collect the judgment; then Reed filed a bill alleging the above stated facts.

Harvey demurred to the bill on the ground that Reed should have made the payment by Sumner a defense to the action at law. Sumner was not Reed's witness; he did not know that Harvey had been paid. The court held that Reed was not bound to take notice of what had transpired between Harvey and Sumner, just before Sumner testified; that Reed was not charged with knowledge of Sumner's acts; that Reed was not required in the action at law to prove a fact of defense which he could not have supposed to exist; that a defense which admitted the existence of the facts alleged in the bill was not entitled to much favor, whatever might have been the foundation of the indebtedness, for the double collection of any debt is not to be encouraged, and that the rule which requires a defendant to make his defense at law, by the presentation of every fact of defense existing at the time of the trial, had no application to a case where a defendant was not privy to the fact, and could not have supposed it to exist. The Reed case, *supra*, did not involve either a mistake of law, fact or theory, but merely and solely the question as to whether equity would enjoin the collection of a judgment obtained at law based upon a debt which the judgment creditor himself admitted had been paid in full before the judgment was recovered, and which the judgment debtor had had no opportunity to defend against and, therefore, had never had his day in court.

In *Bacon v. Bacon, supra*, the material facts were: That Henry D. Bacon died testate, leaving surviving him his widow, a son and two daughters; that his will contained the following clause out of which the litigation arose, to wit: "If my said estate is worth as much as two hundred and fifty thousand dollars, at my death after payment of liabilities as aforesaid I desire that my legal representatives shall pay to the wife of my said son Frank the sum of ten thousand dollars and to the husband or husbands of my said daughters Ella Etta and Carrie Jennie each the sum of ten thousand dollars." The estate was worth more than $250,000. At the time of the death of the testator, Mamie C. Bacon was the wife of the son, Frank P. Bacon. The will was admitted to probate, and later the respective legacies were paid as legacies of two thousand dollars each, and that sum was ac-

cepted and receipted for as payment in full, all parties then believing that the legacies were each for two thousand dollars only. It was shown that at the time of the first reading of the will, shortly after the testator's death, the word "ten," where it appears in the above quoted clause, was erroneously read by all parties present (Mamie C. Bacon was not present) as "two." The attorney of the executors was present and was directed by them to have typewritten copies of the will made and sent to the parties interested. That was immediately done; the copyist, by mistake, writing the amount of the legacies as "two thousand dollars." Thereafter, those copies were used in the subsequent proceedings and the original will was not again carefully read or examined by any person until some three years after the estate was settled. Thus the mistake was perpetuated and repeated in the final decree. Mamie C. Bacon did not expect any legacy would be left to her and did not know anything was given to her by the will until she was informed by her husband shortly after the first reading thereof. He told her it gave her a legacy of two thousand dollars. A day or two later she received a copy from the executors, which gave her the same information. She had every reason to believe that the information was correct. It came from those on whom she had a right to rely. She did rely on them and did believe that the legacy was, in fact, two thousand dollars, and during the course of the whole administration she had no occasion to have a suspicion that it was otherwise. At the hearing of the petition for distribution, the original will, in the handwriting of the testator, was on file; but was not produced, examined or read by or to the court. Upon discovering the mistake, Mamie C. Bacon brought suit against the residuary legatees, in both their individual and representative capacities, to obtain a judgment declaring that the legacy bequeathed to her by the will was ten thousand dollars; that of that sum eight thousand dollars, with interest, remained unpaid, and that the decree of distribution, with respect to the recitals that the legacy was two thousand dollars, and that it had been paid and satisfied, be held void. The court says that: "A photographic copy of the will is inserted in the record. Upon a casual reading, a

person of ordinary skill in deciphering penmanship might easily mistake the word 'ten,' in the two places where it appears therein, for the word 'two,' and believe that the legacies were each for $2,000; but, upon a careful reading, especially upon a comparison with the formation of the same letters in other parts of the will, and without the aid of a microscope, no person of experience could doubt that the word is 'ten,' and that the legacies are each for $10,000, and not for $2,000." Upon those facts, the California court held that, as there had never been any *real contest* with reference to the amount of plaintiff's legacy, the mistake was not one of the court by which the decree of distribution was entered, but of the parties interested in the estate, and that it was, therefore, properly vacated on that ground. In the case at bar, appellant had its day in court, and an opportunity to (and did) defend, and there was a real contest upon the issue as to whether the flow of oil was temporary or permanent; therefore, the Bacon case, *supra,* is not in point.

In *Anshutz v. Louisville Ry. Co., supra,* a fetus was mistaken for a tumor. Upon the discovery of the mistake, the railway company commenced an independent suit, under a Kentucky statute, for a new trial of the case in which judgment was recovered against the company. In Kentucky, where grounds for a new trial are discovered after term time, the statute gives an aggrieved party a remedy in the nature of an independent suit, i. e., by the filing of a petition (not later than the second term after the discovery), and service of summons on the adverse party. The Anshutz case, *supra,* is not in point here, because we do not have a statute which provides for the prosecution of an independent suit for a new trial, under any circumstances, either upon the ground of newly discovered evidence in that a fetus has been mistaken for a tumor, or upon any other grounds. That case does not appear to be authority for more than this: That where a suit for a new trial is commenced within the time prescribed by statute, on the ground of newly discovered evidence, and it is satisfactorily shown why the evidence was not discovered and produced at the trial, and it appears clearly and unmistakably that a fetus has been mistaken for a tumor, and the lower court, upon that showing, has made

an order granting a new trial, the order, on appeal, will be affirmed.

Conceding that a court of equity, in a proper case, has inherent power to grant relief (upon the ground of newly discovered evidence) from judgments obtained by mistake, fraud or perjury, in an independent suit, without statutory authority, after the time has expired within which to move for a new trial, must the aggrieved party show that it exercised reasonable diligence to discover and produce the newly discovered evidence at the trial?

In the Anshutz case, *supra,* relied upon by the Lumber Company, the court held: "That where the newly discovered evidence is of such conclusive nature, or even of such decisive or preponderating character as that it would, with reasonable certainty, have changed the verdict, or materially reduced the recovery, a new trial should be granted, *if it is satisfactorily shown why the same was not discovered and produced at the trial.*" (Emphasis mine.)

Our statute (section 7–602, I. C. A.), like the Kentucky statute, provides that a new trial may be granted, upon "Newly discovered evidence, material for the party making the application, which he could not, with reasonable diligence, have discovered and produced at the trial."

It has been repeatedly held by this court that to entitle one to a new trial upon the ground of newly discovered evidence, it must be shown that the newly discovered evidence could not, with reasonable diligence, have been discovered and produced at the trial. (*Livestock Credit Corp. v. Corbett,* 53 Ida. 190, 22 Pac. (2d) 874; *Amonson v. Stone,* 30 Ida. 656, 167 Pac. 1029; *Stolz v. Scott,* 28 Ida. 417, 154 Pac. 982; *Montgomery v. Gray,* (on rehearing) 26 Ida. 585, 144 Pac. 646; *Hall v. Jensen,* 14 Ida. 165, 93 Pac. 962.)

A court of equity ought to require, at the least, that a suitor, seeking relief from a judgment upon the ground of newly discovered evidence (in an independent suit commenced after the time has expired under the statute in which to move for a new trial), show the same diligence a litigant is required to show who moves for a new trial under the statute. Delay and procrastination should not be favored by the courts. If it were made easier to obtain a new trial

by an independent suit in equity than upon motion for a new trial, and if a remedy by an independent suit were available to a suitor at any time he might choose to commence it, few suitors, if any, would move for a new trial under section 7–602, *supra*, with the result that there would be no end to litigation.

In an attempt, apparently, to show the exercise of reasonable diligence, the Lumber Company alleges that:

"plaintiff herein now shows and represents to the Court that it has lately, and long since the time expired for presenting the same in connection with its motion for new trial, obtained evidence that the water of Grimes Creek is no longer contaminated or polluted with oil and grease, and that if such water ever was so contaminated said oil and grease have now ceased to flow and no longer pollute or contaminate such water. That for many years last passed the water of Grimes Creek below the mouth of the tributaries on which the logging operations were conducted by the Lumber Company has been used throughout the year and as long as such water would flow for placer mining purposes by numerous people, including the said Atkinson, for operating placer mining dredges and other placer mining machinery and equipment, without any hindrance or interference whatsoever from oil or grease, and there is not now, and has not been for several years last passed, sufficient oil or grease in the water of Grimes Creek below the mouth of the tributaries on which said logging operations were conducted to interfere with any mining operations such as were carried on by the Mining Company, or such as are best adapted to the mining of the ground owned by the Mining Company and for which it recovered damages."

If, as the Lumber Company alleges, the water of Grimes Creek for many years last past has been used throughout the year and as long as such water would flow, for placer mining purposes, by numerous people, and if, for several years last past, there has not been sufficient oil and grease in the water of that creek to interfere with such mining operations as were carried on by the Mining Company, then the Lumber Company must have known it, or, to say the least, could have discovered the facts by the exercise of reasonable dili-

gence. Surely numerous people could not have been engaged in placer mining on that stream, *"for many years last passed"* (emphasis mine), without interference from oil and grease (which period may be reasonably inferred to be long enough to reach back to the date of the commencement of the action for damages), without the Lumber Company having learned something about it in time to have taken such steps as were necessary to obtain and produce the evidence at the trial, or in support of its motion for a new trial.

The Lumber Company further alleges that: "The evidence now available could not, by reasonable diligence, have been obtained in time to be used on the trial of the cause or within the time fixed by law for applying for a new trial on the ground of newly discovered evidence." That is an averment of a conclusion. The Lumber Company does not allege when, with reference to the trial of the action for damages, it took steps to discover the new evidence, nor does it allege the nature of the steps taken, nor why the steps taken, if any, could not have been taken and the new evidence discovered in time to have been produced on the trial of the damage action. In the absence of a showing that the period between the date the Lumber Company made its motion for a new trial in the law action, and the date of the commencement of this suit, was reasonably required to determine, by independent tests, or otherwise, that the oil had ceased to flow from the watershed of Grimes Creek and its tributaries, down to, over and through the placer mining claims, it may fairly be deduced from the allegation of the Lumber Company: *"it has lately, and long since the time expired for presenting the same in connection with its motion for new trial* (emphasis mine), obtained evidence that the water of Grimes Creek is no longer contaminated or polluted with oil and grease," that if any steps were taken to discover the alleged new evidence, they were not taken until shortly before the suit at bar was commenced, which falls far short of showing the exercise of reasonable diligence. The showing is insufficient to authorize the granting of a new trial, upon the ground of newly discovered evidence, if it were being made under the statute (section 7–602, *supra*), and, applying the requirement of the statute to this, an independent suit,

brought for the same purpose, the showing is likewise insufficient.

 It is contended by the Lumber Company that the Mining Company is guilty of concealing evidence, in this: "by concealing from the Lumber Company the fact that damage was being caused, they deprived the Lumber Company of the opportunity to obtain proof on one of the essential factors in establishing the value of the ground and the amount of the damage," citing numerous cases, among them, the following: *Corley v. New York & Harlem R. R. Co.*, 12 App. Div. 409, 42 N. Y. Supp. 941; *Tomkins v. Tomkins*, 11 N. J. Eq. 512; *Monk et al. v. Morgan et al.*, 49 Cal. App. 154, 192 Pac. 1042.

In the Corley case, *supra*, there was a planned concealment of the true physical condition of the infant. The railroad company had no notice, or warning, whatever, that crutches were being used by the infant in going to, and returning from, the witness-stand, for the sole purpose of concealing the fact that he could, if he chose, walk without crutches. Here, the Lumber Company had general notice of the grounds upon which the Mining Company would rely for the recovery of a judgment against it, from the date of the service of the complaint, and, in consequence, the Lumber Company had full opportunity to prepare its defense by making independent tests of the placer ground to determine whether oil was flowing, and if so, whether it was still flowing in sufficient quantities to interfere with the operations of the Mining Company, and to expose the alleged fraud of the Mining Company, if the independent tests showed that the operations were not actually being interfered with, or if oil at one time had interfered with the mining operations, that it had ceased to flow.

In the Tomkins case, *supra*, the plaintiff in the case in which the judgment at law was obtained concealed from the defendant therein, knowing where he was, the fact that the action had been commenced against him, and that his interest in the forty-acre tract had been attached, until after the judgment was recovered. The absent defendant was not given an opportunity to defend and he had never had his day in court.

In the Monk case, *supra*, the administrator concealed from the New York heirs the fact that the Cox estate was being probated, and that he was representing to the court that he and his sister were the sole heirs of the deceased, until after the decree of distribution had been entered, and the administrator concealed from the probate court the fact that there were other heirs of the deceased also entitled to share in the Cox estate. The New York heirs had no opportunity to establish the fact that they, too, were heirs of the deceased and, as such, entitled to share in the estate along with the California heirs, and the New York heirs had never had their day in court.

We turn now to a consideration of a few of the many cases cited and strongly relied upon in support of the Lumber Company's general charge of fraud against the Mining Company, to wit: *Chiatovich et al. v. Mercer et al.*, 48 Nev. 344, 232 Pac. 215; *Taylor v. Nashville & C. R. Co.*, 86 Tenn. 228, 6 S. W. 393; *Chicago, R. I. & P. Ry. Co. v. Callicotte*, (C. C. A., 8th Circuit), 267 Fed. 799, 16 A. L. R. 386.

In the Chiatovich case, *supra*, it is clear that the fraud relied upon in the action at law to defeat a recovery on the Chiatovich Ranch note was the alleged fraud of Thornberry in obtaining the note, and not the fraud of the bank and Thornberry, which consisted, among other things, of the prosecution by the bank of the action on the note, as an innocent purchaser, for the benefit of Thornberry, thereby preventing the Chiatovichs from successfully pleading and proving Thornberry's fraud in obtaining the note, which the Chiatovichs could have done had Thornberry himself prosecuted the action. While a second mortgage had been taken to secure payment of the ranch note, and the Chiatovichs set that up in support of their motion for a new trial, the bank represented that the second mortgage was not security for the Thornberry note, as the full value of the mortgaged property would be exhausted by the first mortgage, and other amounts that preceded the second mortgage to the bank. No fraud was committed in taking the second mortgage. The acts constituting the attempt to make a double collection, and to thus defraud the Chiatovichs, were: The collection of the Chiatovich Ranch note from Thornberry, by

the bank, for its own benefit, in the foreclosure suit; the attempt made by the bank to also collect the note from the Chiatovichs, for the benefit of Thornberry, by the prosecution of an action at law on the note and the recovery of judgment thereon; and the issuance of an execution and the placing of the same in the hands of the sheriff, after the time had passed within which the Chiatovichs could set up that fraudulent conduct in support of their motion for a new trial. The Chiatovichs never had had their day in court, nor an opportunity to defend against the said fraud of the bank and Thornberry.

*Taylor v. Nashville & C. R. Co., supra,* is another case where a judgment at law was recovered before the discovery of the fraud practiced to obtain it. There was no notice or knowledge of the commission of the fraud until it was too late to plead it as a defense and prevent the recovery of the judgment. In fact, there was not even a suspicion that a fraud was being practiced. Here, the Lumber Company (after the issues were made up in the law action in which the judgment was recovered) knew exactly what the Mining Company would attempt to prove in its efforts to recover (at least the Mining Company's complaint was sufficient to put the Lumber Company on notice), and knowing that, it could have taken prompt steps by independent tests to discover whether the placer claims contained gold-bearing sand and gravel, and if so, the value; also, as to whether the oil and grease used in its logging operations so interfered with the placer mining operations of the Mining Company as to make it impossible to amalgamate and recover the gold, and, if the oil was still flowing down, over and through the placer claims, to further check by such tests the truth or falsity of the theory as to whether the flow would, or would not, continue for an indefinite length of time.

In the Callicotte case, *supra,* it appears that the defendant in the action at law never had had its day in court in that it had no notice whatever that temporary paralysis, at the times of examination of Callicotte by medical experts, was produced by artificial means and, therefore, that the defendant railroad company had had no opportunity to defend against the particular fraud, by means of which the

judgment against it was obtained. It further appears that the fact that temporary paralysis had been artificially produced, could not be detected by ordinary medical tests, whereas in the case at bar, the fraud charged against the Mining Company, if a fact, could have been detected by independent tests of the placer ground; such tests would have fully disclosed whether the claims of the Mining Company were, or were not, fraudulent. Furthermore, the Lumber Company was not prevented by any act of the Mining Company from making tests of the placer ground.

In support of the third ground, to wit, perjury, relied upon by the Lumber Company for a reversal of the judgment of dismissal entered by the court below, the Lumber Company cites numerous cases, among them, the following: *Sargent Co. v. Baublis et al.*, 127 Ill. App. 631, 639; *El Reno Mutual Fire Ins. Co. v. Sutton*, 41 Okl. 297, 137 Pac. 700, 50 L. R. A., N. S., 1064; *Bumpus v. Lyon*, 133 Me. 125, 174 Atl. 265; *Boring v. Ott*, 138 Wis. 260, 119 N. W. 865, 19 L. R. A., N. S., 1080.

In the Baublis case, *supra*, the Sargent Company had no notice whatever of the Golubicki-Baublis conspiracy to fabricate a case against it, until after the judgment obtained in the action at law had been affirmed in the supreme court. The conspiracy to defraud the Sargent Company was not an issue in the action to recover damages. Therefore, the company never had had its day in court on, nor an opportunity to make a defense to, the Golubicki-Baublis conspiracy to defraud it, to wit, an opportunity to defend against the civil conspiracy to defraud, concocted by Golubicki and sworn to by Baublis, by means of which the Baublis judgment was recovered, and without which, it may fairly be assumed, Baublis would not have prosecuted the case against the company, because it appears that the idea of fabricating a case against the company originated with Golubicki, and not with Baublis. To repeat, it appears in the case at bar that the Lumber Company had notice, from the date of the service of the complaint in the action for damages, of the general nature of the Mining Company's action, and of the general nature of the evidence which

must, of necessity, be offered by the Mining Company to prove its case. Consequently, the Lumber Company had an opportunity to defend against the case of the Mining Company, about which it now complains.

The El Reno Mutual Fire Insurance Company case, *supra,* is not in point here for the reason, first, that immediately upon learning that the insured goods had not been destroyed by fire but had been moved into New Mexico, the company moved swiftly and diligently by search-warrants, to, and did, cause such goods to be returned to the state of Oklahoma, the seizure and return of the identical goods insured, leaving no doubt whatever but that the judgment against the company was obtained by perjury; and, secondly, the company brought its suit under an Oklahoma statute, which we do not have, providing that a district court shall have power to vacate or modify its own judgment, after the term at which the judgment was entered, for fraud practiced by the successful party in obtaining the judgment.

*Bumpus v. Lyon, supra,* was not an action to restrain the enforcement of a judgment. It was an appeal from an order denying a new trial and has no application here.

In *Boring v. Ott, supra,* the court held that equity will enjoin the enforcement of a judgment secured by perjury where the judgment debtor used diligence, but failed to discover the perjury in time to be available at the trial, or to secure the relief provided by statute in such cases; the court further held, however, that equity will not restrain the enforcement of a judgment on the ground that it was secured by perjury unless the perjury is established beyond all reasonable controversy by evidence clear, convincing and satisfactory, and reversed the judgment of the trial court which had perpetually restrained the enforcement of the judgment obtained by Ott. The Boring case, *supra,* is not in point here because of the absence of a showing of reasonable diligence to discover the alleged perjury, and for the further reason that the complaint in the case at bar does not allege a state of facts showing clearly, and convincingly, and beyond all reasonable controversy, that the judgment was recovered against the Lumber Company by perjury.

In support of its charge of perjury, the Lumber Company alleges that "the Mining Company submitted evidence as to the value of its ground, which it represented was the result of drill tests made before the ground was dredged, and which evidence it was impossible for the Lumber Company to check by tests made after the ground had been dredged; that, . . . . as the Lumber Company is now informed and believes, and so alleges the fact to be, the ground which had been so tested was covered by from 16 to 18 feet of gravel and debris that had been previously mined and from which the gold had been extracted by earlier mining operations and the values to which the said S. K. Atkinson and other witnesses for the Mining Company testified as being average values from the surface to bedrock, were in truth and in fact the values in the lower three or four feet of ground immediately above bedrock and below the debris and gravel which had been previously mined, and such values were not the average values from the surface of the ground to bedrock, as testified to and represented by the witnesses for the Mining Company, but, for the reasons hereinbefore alleged, it was impossible for the Lumber Company to protect its rights in the premises or determine the truth of such evidence after the ground had been dredged and the gravel commingled with the water, which the Mining Company claimed had been so polluted and contaminated that the value in the dredged gravel could not be accurately ascertained and determined; that by the dredging of the ground, the surface gravel and the bedrock gravel had been completely mixed and commingled and their relative positions changed to such an extent that it was impossible to determine the values that had been found in the different layers or strata before dredging, . . . . "

Upon those and similar allegations, the Lumber Company bases its charge of perjury against the Mining Company. If, "by the dredging of the ground, the surface gravel and the bedrock gravel had been completely mixed and commingled and their relative positions changed to such an extent that" (at the time of the trial of the action at law) "it was impossible to determine the values that had been found in the different layers or strata before dredging," it would neces-

sarily be just as impossible to determine such values upon a trial of this suit; and if, at the time of said trial, on account of the dredging, it was impossible for the Lumber Company to protect its rights or determine the truth of the Mining Company's evidence, it would be equally impossible for the Lumber Company to protect its rights or determine the truth of that evidence upon a trial of the instant case, no change having been shown or alleged. Furthermore, and as hereinbefore pointed out, the Lumber Company does not sufficiently show why the evidence of the alleged perjury could not have been discovered in time to have been available at the trial of the action at law.

The fourth, and last, ground upon which the Lumber Company relies is, that the Mining Company by its conduct and testimony deprived it of its property without due process of law, citing *Mooney v. Holohan;* 294 U. S. 103, 55 Sup. Ct. 340, 79 L. ed. 791, 98 A. L. R. 406. In February, 1917, Mooney was convicted of murder in the first degree and sentenced to death, which sentence was subsequently commuted to life imprisonment. The Supreme Court of California refused to relieve Mooney from that judgment of conviction. In 1934, every effort to obtain relief having failed, Mooney moved in the Supreme Court of the United States for leave to file a petition for an original writ of *habeas corpus.* Mooney charged that the state of California held him in confinement without due process of law in violation of the Constitution of the United States. In substance, the pertinent grounds of his charge were: That the sole basis of his conviction was perjured testimony, knowingly used by the prosecuting authorities in order to obtain a conviction, and that such authorities deliberately suppressed evidence which would have impeached and refuted the evidence thus given against him. Upon that showing, admitted by Holohan, respondent, the court said: ''That requirement (due process), in safe-guarding the liberty of the citizen against deprivation through the action of the State, embodies the fundamental conceptions of justice which lie at the base of our civil and political institutions. . . . . It is a requirement that cannot be deemed to be satisfied by mere notice and hearing if a State has contrived a conviction through the pretence of a

trial which in truth is but used as a means of depriving a defendant of liberty through a deliberate deception of court and jury by the presentation of testimony known to be perjured. Such a contrivance by a State to procure the conviction and imprisonment of a defendant is as inconsistent with the rudimentary demands of justice as is the obtaining of a like result by intimidation.''

It is contended by the Lumber Company that the case at bar ''is in all respects parallel'' to the Mooney case in this: That the Mining Company suppressed evidence of the value of the mineral-bearing sand and gravel by means of its dredging operations, in that by the dredging operations the positions of the surface gravel and the bedrock gravel were changed to such an extent that it was impossible to determine the values that had been found in the different layers or strata before dredging; that, having so made it impossible for the Lumber Company to determine the actual values of the dredged ground, the Mining Company represented that tests made by it before the ground was dredged ran as high as 30¢ to 32¢ per cubic yard, when, in truth and in fact, the ground which had been so tested was covered by from 16' to 18' of gravel and debris which had been previously mined, and from which the gold had been previously extracted; that the values, to which the Mining Company's witnesses testified as being average values from the surface to bedrock, were, in truth and in fact, the lower three or four feet of ground immediately above bedrock and below the debris and gravel which had been previously mined; that such values were not the average values from the surface of the ground to bedrock. In other words, changing and mixing the surface layers, which had been previously mined, with the bedrock layers, and so making it impossible to determine average values, is charged by the Lumber Company as the suppression of evidence, and the testimony of the witnesses of the Mining Company that tests made before dredging showed the average values of the mineral-bearing sand and gravel to run as high as 30¢ to 32¢ per cubic yard, is charged as being false. From the allegation of the Lumber Company that the dredging operations of the Mining Company (and the consequent mixing of the debris and surface sand with

the bedrock sand) made it impossible for the Lumber Company to determine the truth of such evidence, it at once becomes apparent that the charges of suppression of evidence and perjury are groundless. If, as alleged, the dredging operations made it impossible to determine, at the time of the trial of the action at law, the truth of the values testified to by the witnesses of the Mining Company, no change of the conditions then existing being shown or alleged in the suit at bar, then, how can it be successfully charged either that the Mining Company suppressed evidence or that its witnesses committed perjury, without any evidence upon which to determine whether the testimony of the witnesses of the Mining Company as to average values was true or false, and none being possible, as shown by its own complaint? Nevertheless, the Lumber Company charges both perjury and the suppression of evidence. The allegation that it was impossible to determine the truth of the testimony as to values completely refutes the charges of perjury and suppression of evidence. We quite agree with the interpretation the Lumber Company places upon the decision of the United States Supreme Court to the effect the Fourteenth Amendment demands more than a ''mere notice and hearing,'' and more than a mere contrivance for putting an end to a controversy. But conceding that does not help the Lumber Company because its complaint, in the suit at bar, discloses that there was an actual contest in the action at law upon the decisive issues: whether oil and grease were present in the placer ground; if so, whether the oil and grease prevented the amalgamation of gold; the value of the placer ground; whether oil and grease would continue to flow from the watershed of Grimes Creek down to, over and through the placer ground for an indefinite length of time, and, lastly, whether the mining property, by reason thereof, had been totally destroyed.

The Mooney case, *supra*, and the case at bar are not similar in pertinent essential particulars. Mooney charged in his petition, in effect, a ''frame-up'' by the prosecuting authorities to convict him by the suppression of evidence and by the use of evidence which such authorities knew to be false; from which charge, assuming it to be true, solely because it

was not denied (we, of course, do not know what the actual facts were), the conclusion follows that the Mooney trial was a mere contrivance for convicting Mooney; and again assuming that the Mooney charge was true, because it was not denied, he did not have a trial in the true sense of that word; on the other hand, in the case at bar, the Lumber Company had a trial in every sense of that word, in which the issues it now seeks to have litigated were actually tried and disposed of.

In denying Mooney relief, California followed the rule in *United States v. Throckmorton*, 98 U. S. 61, 25 L. ed. 93, relied upon by the Mining Company, in which case it was held that the frauds for which a bill in chancery will be sustained, to set aside a judgment or decree, between the same parties, rendered by a court of competent jurisdiction, are frauds extrinsic or collateral to the matter tried by the first court and not frauds which were in issue in that suit. This court, in passing upon the same question, as to the frauds for which a bill in chancery would be sustained, also followed the rule in the Throckmorton case, *supra* (*Donovan v. Miller*, 12 Ida. 600, 88 Pac. 82, 10 Ann. Cas. 444, 9 L. R. A., N. S. 524).

██ In response to the question as to whether the complaint in the case at bar states a cause of action, we point out some of its fatal defects: The absence of a showing as to the means by which the Lumber Company claims to have discovered that the oil had ceased to flow, was not now present in the placer ground and would not now interfere with mining operations, and as to how that can now be established; the absence of any showing as to the means by which the Lumber Company claims to have discovered that the average value of the dredged placer ground did not run as high as 30¢ to 32¢ per cubic yard, and as to how that can now be established (*United States v. Throckmorton*, 98 U. S. 61, 70, 25 L. ed. 93, 96); the absence of any showing as to why the evidence which the Lumber Company claims to have discovered was not discovered in time to have been available at the trial of the action at law. It is well settled that a party seeking relief must not himself be negligent. (*Marine Ins. Co. v. Hodgson*, 7 Cranch, 332, 3 L. ed. 362; *Marshall v. Holmes*, 141 U. S. 589, 12 Sup. Ct. 62, 35 L. ed. 870; *Folwell*

*v. Howell,* 117 Conn. 565, 169 Atl. 199; *Bacon v. Bacon,* 150 Cal. 477, 89 Pac. 317; *National Surety Co. v. State Bank of Humboldt,* 120 Fed. 593; *Barnes v. Milne,* Rich. Eq. Cas. (S. C.) 459, 24 Am. Dec. 422; 15 R. C. L. 752; *Bumpus v. Lyon,* 133 Me. 125, 174 Atl. 265; *Bolden v. Sloss-Sheffield Steel & Iron Co.,* 215 Ala. 334, 110 So. 574, 49 A. L. R. 1206; *Laun v. Kipp,* 155 Wis. 347, 145 N. W. 183, 5 A. L. R. 655; *Ennor v. Galena & So. Wis. R. R. Co.,* 14 Ill. App. 327; *Polarek v. Gordon,* 102 Ill. App. 356; *Bibend v. Kreutz,* 20 Cal. 109, 110; *Pickford v. Talbott,* 225 U. S. 651, 32 Sup. Ct. 687, 56 L. ed. 1240.)

Furthermore, it is the settled rule in equity that a defense is not to be deemed "newly discovered," or lost by "accident or mistake," if it was or should have been within the knowledge of the party when he was called upon for his defense in the action at law. (*Pickford v. Talbott, supra.*)

We conclude that the complaint does not state facts sufficient to constitute a cause of action. Judgment affirmed. Costs to respondent.

Givens, C. J., Morgan, J., and Rice, D. J., concur.

Budge and Ailshie, JJ., did not sit at the hearing nor participate in the opinion.

Petition for rehearing denied.